THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDDIE L. FRANKLIN (Impleaded), Defendant-Appellant.

(No. 57253;

First District (3rd Division)—July 3, 1974.

*Modified opinion on denial of rehearing September 19, 1974.*

Paul Bradley and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE McGLOON delivered the modified opinion of the court:

The defendant Eddie L. Franklin was indicted for the offenses of murder and attempted armed robbery. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1; Ill. Rev. Stat. 1969, ch. 38, par. 8—4.) After a jury trial he was found not guilty of the offense of murder, but guilty of the offense of attempted armed robbery, and sentenced on that conviction to a term of 9 to 14 years in the penitentiary.

In this appeal the defendant presents a number of issues for our consideration. First, whether the trial court erred in failing to suppress the defendant's warrantless arrest, which resulted in the seizure of certain physical evidence and the defendant's subsequent identification by certain witnesses. Second, whether the indictment charging the offense of attempted armed robbery was fatally defective as it failed to allege an essential element of the offense, and in the same vein, whether the State failed to prove a material allegation of the indictment. Third, whether the trial court erred in refusing to suppress a certain lineup which resulted in the defendant's identification and subsequent in-court identification. Fourth, whether the trial court erred in refusing to give an offered instruction concerning the weight to be given the testimony of a narcotics addict. Finally, whether his sentence must be reduced to conform to the requirements of the Illinois Unified Code of Corrections.

Judgment vacated and remanded.

The relevant facts surrounding this case are as follows. On December 12, 1969, four men attempted to rob the Gateway National Bank of Chicago. During the attempted robbery, a bank guard, Richard Mix, was critically wounded by one of the offenders and died 4 days later. On December 22, 1969, two Chicago Police officers assigned to investigate the Gateway robbery arrested two men, Lee Bates and Gerald Brooks, who were eventually indicted along with Franklin for the murder and attempted armed robbery. During the questioning of these suspects both admitted their participation in the crime, and also implicated Franklin as one of the robbers.

Later that day, at approximately noon, the officers, investigators Moore and Craig, along with other officers, proceeded to Franklin's apartment and there arrested him. While making the arrest the officers also seized certain items from the defendant's apartment, among which were a pair of men's pants, variously described as burgundy, lavender or "hot pink", a three-quarter length camel hair coat with a fur collar, an afro-style wig and a black cap. These items were seized because they seemed to fit the description of the clothing worn by one of the Gateway gunmen given by witnesses to the attempted robbery. These items of clothing were not worn by the defendant at the time of his arrest, but, the officers testified, were in plain view in various areas of the apartment when defendant was taken into custody.

Still later that day, December 22, the defendant was placed in a lineup at a Chicago Police Station at which time he was identified by two bank employees as a participant in the December 12 crimes. Prior to the lineup the defendant was instructed to change from the clothes he wore when arrested into the pants, coat and cap that were seized in the apartment. After viewing the lineup one witness, Alexia Byrd Jackson, positively identified the defendant and another, Gloria Clifford Jones, told police that the defendant "was the man," although his hair, among other things was different than on December 12. The defendant was then instructed to put on the seized wig, whereupon witness Jones again viewed him and again identified him as one of the offenders. None of the other witnesses who viewed the lineup could identify the defendant.

Subsequently, the defendant filed motions to suppress his illegal arrest and to suppress any lineup or in-court identification of him by the State's witnesses. After an extensive hearing on the motions the trial judge denied defendant's motion to suppress his arrest finding that the arrest was based on a sufficient showing of probable cause and the items seized at the time of arrest were in plain view. In regard to the December 22 lineup the trial judge found that although the lineup "was to an extent

suggestive," witness Jones identified the facial features of the defendant and was not influenced by defendant's clothing and therefore denied the motion as to her. As to witness Jackson the trial judge found that in her testimony her concern seemed "to be centered more on the clothing that was worn" and therefore granted the motion to suppress her testimony.

At trial Gloria Clifford Jones testified that she was an employee of the bank and was working as a teller on the morning of December 12, 1969. She stated that while working that morning she heard a scuffle and looked up to see a man fighting with the bank guard, Richard Mix. She saw the man aim a gun at Mix's head and shoot. The man then turned and pointed the gun at her and she ducked behind the counter and remained there until after he had left. She described the man who shot Mix as a Negro with a goatee, mustache, and an afro hair style. He was wearing a beige coat with a fur collar and "hot pink" pants. She further identified the defendant as the man who shot Mix and the pants and coat seized at the time of his arrest as exactly like those worn by the defendant on that morning. Further, she stated that she had seen the defendant three times near the bank 2 days before Decembr 12. She remembered him because he had tried to "flirt" with her on these occasions and he wore the same coat and pants as on the morning of the shooting. She also testified that on December 22, 1969, she viewed a lineup at which time she identified the defendant. At that time he was wearing the same coat, pants and wig that she had identified previously.

Alexia Byrd Jackson testified that she also was an employee of the bank on December 12, 1969. On that morning she saw four men enter the bank. One of the men had a "natural" hairdo, a mustache and goatee, and was wearing a tan coat with a fur collar, "hot pink" pants and a black cap. After these men entered, she heard a shot and fell to the floor. Although the trial judge had previously allowed a motion to suppress her identification testimony, she was allowed to testify that she viewed a lineup on December 22, 1969, at which time she saw the number one man in the lineup wearing a brown coat with a fur collar and "hot pink" pants. She also identified a picture as accurately representing the lineup that she had seen. After this testimony the defendant moved for a mistrial, which motion was denied by the trial court.

Marcia Kazwara testified that she was the vault manager at the Gateway Bank on December 12. She heard a shot and looked up to see Mix fall backwards and a man in a beige coat with a dark collar. Another man with a gun came up to her and ordered her to open the vault. She told the gunman that she could not open the vault because she did not have the combination, whereupon the gunman turned and left the building.

Gerald Brooks testified that he was one of the four men who attempted to rob the Gateway Bank on the morning of December 12, 1969. He testified that the defendant was also one of the four men and that on that morning the defendant was wearing a camel coat with a mink collar and burgundy pants. Brooks stated that he was the man who ordered Marcia Kazwara to open the safe, and the defendant's assignment had been to disarm the guard. He further stated that after they left the bank the defendant told him that he had to shoot Mix because the guard had tried to pull his gun. Brooks admitted that he had been a heroin addict for 5 years prior to December 12, 1969, and that at the time of trial he was receiving methadone at Cook County Jail to support his habit.

Other witnesses testified as to the events at the bank on December 12 and to the circumstances surrounding the defendant's arrest. In defense the defendant testified that he did not shoot Mix or participate in the attempted robbery on December 12. He further denied that he had been near the bank prior to December 12.

At the close of all the evidence the defendant offered an instruction on the credibility of narcotics addicts which was refused by the trial judge. The jury returned verdicts finding defendant not guilty of murder and guilty of attempted armed robbery whereupon he was sentenced as aforementioned.

The first issue presented for review is whether the defendant's arrest on the morning of December 22, was lawful. The defendant argues that because his arrest was effectuated without a warrant, when the police had the opportunity to secure a warrant, his arrest was unlawful and the clothing seized in his apartment and his later identification by witnesses should have been suppressed as they were a consequence of the unlawful arrest. The defendant does not argue that the police either lacked probable cause to make the arrest or exceeded the scope of a search incident to arrest, but merely that the lack of a warrant when they had time to secure one, voided the arrest. We cannot agree with defendant's contention.

■■ Section 107—2(c) of the Code of Criminal Procedure of 1963 provides: "A peace officer may arrest a person when: (c) He has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1969, ch. 38, par. 107—2(c).) Further our supreme court, passing upon the same issue presented here in a factual situation similar to the instant case, said:

> "Defendant argues, incorrectly, that a warrantless entry is permissible only in hot pursuit, or in any emergency when it is impractical to obtain a warrant. We agree that it is desirable for an arrest to be based upon a warrant when the circumstances permit,

\* \* \*. At the same time, however, we recognize that an arrest may be lawful when based upon probable cause, notwithstanding the absence of a warrant." *People v. Johnson* (1970), 45 Ill.2d 283, 287-88, 259 N.E.2d 57, *cert. denied,* 407 U.S. 914.

In *Johnson,* as in the instant case, the police were in possession of sufficient facts to cause a reasonable man to believe that a crime was committed and the defendant was one of the offenders. Therefore, their warrantless arrest of the defendant was lawful, as there is no requirement in this jurisdiction that they must first secure a warrant.

The defendant next contends that the indictment charging him with attempted armed robbery is fatally defective because it does not allege that the defendant attempted to take property from the person or presence of the victim. The indictment states, in pertinent part, as follows:

"\* \* \* that on December 12, 1969, \* \* \* Lee Bates, Eddie L. Franklin, Gerald Brooks and Paul Bullock committed the offense of attempt in that they, with the intent to commit the offense of armed robbery, attempted to take the property of Marcia Kazwara, an employee of the Gateway National Bank, by force and while armed with a dangerous weapon, in violation of Chapter 38, section 8—4, of the Illinois Revised Statutes, 1969 \* \* \*."

 The rule in this State is that an indictment is sufficient when it states the elements of the offense with sufficient particularity to apprise the accused of the crime charged so as to enable him to prepare his defense and permit a conviction or acquittal to be pleaded in bar of any subsequent prosecution for the same offense. (*People ex rel. McLain v. Housewright* (1973), 9 Ill.App.3d 803, 293 N.E.2d 911.) The fact that an indictment does not allege an offense in the verbatim language of the statute does not mean that the charge is automatically defective. Here the indictment clearly charges the offense of attempted armed robbery and could not conceivably hinder the defendant in the preparation of his defense. Further, a conviction or acquittal of this charge would allow it to be used as a plea in bar, were any subsequent prosecution for the attempted bank robbery of December 12 undertaken.

Similarly, the defendant next argues that his conviction for attempted armed robbery must be reversed because the State failed to prove a material allegation of the indictment, *i.e.,* that the State failed to prove that Marcia Kazwara owned the property that the defendant allegedly attempted to steal. We cannot agree.

The cases hold that when an indictment for the offense of robbery or armed robbery alleges the ownership of the property in the victim the State must prove either that the victim owned the property or had possession, custody or care of the property. (*People v. Steenbergen* (1964),

31 Ill.2d 615, 203 N.E.2d 404; *People v. Daniels* (1933), 354 Ill. 600, 188 N.E. 886.) In the instant case the State sustained its burden of proof. Marcia Kazwara testified that she was employed by the Gateway National Bank as the vault manager. On the morning of December 12 she was at her desk, which was located inside the vault area of the bank. She had in her desk the keys to the security room of the vault and used them, at the direction of one of the offenders, on the morning of the attempted robbery. Although she did not have the combination to the vault itself, and admittedly did not personally own the money in the vault, her testimony clearly established that she was the bank employee who had custody and care of the bank's property. The defendant's argument that the State did not prove witness Kazwara had custody and care of the property is not well founded.

■■ The defendant next contends that the lineup in which he was identified on December 22, 1969, was unconstitutionally suggestive and that the trial court therefore erred when it admitted into evidence lineup identification testimony and an in-court identification of defendant as it was a result of the invalid lineup. Although the December 22 lineup was conducted in an otherwise exemplary fashion, the defendant argues that because he was made to wear clothing fitting the description of clothing worn by one of the bank robbers the identification procedure was unnecessarily suggestive and conducive to irreparable misidentification. We must agree.

At the time of defendant's arrest the arresting officers also properly seized certain clothing owned by the defendant, as they believed that this clothing fit the description given by bank employees of the clothing worn by one of the offenders on December 12. The fact that the defendant owned this clothing was certainly circumstantial evidence indicating a possibility of his guilt. However, the police did more than merely seize the clothing as evidence, they caused the defendant to change into this clothing prior to a lineup in which he was identified by two bank employees; Alexia Byrd Jackson and Gloria Clifford Jones.

The effect of this procedure on the identification witnesses can best be seen from their own testimony during the hearing on defendant's motion to suppress. In regard to witness Jackson, the trial judge commented upon her testimony as follows: "She was highly nervous. She paused a great deal after many of her sentences, many of her answers. She obviously was frightened. She is properly described as a weak witness from the standpoint of identification. Her concern in the testimony seems to be centered more on the clothing that was worn. She said identical clothing. She was always talking about the identical clothing. To her, the clothing was a big factor." Indeed, our own review of her testi-

mony at the hearing reveals that although she was unable to remember many of the details surrounding the lineup procedure, she clearly remembered that the man she identified at the lineup was wearing the same clothing that she described as being worn by one of the gunmen on December 12.

In regard to witness Jones, she also clearly remembered that at the lineup the defendant was wearing the same clothing that she saw on the gunman who shot Mix. When asked whether the picture of the December 22 lineup showed all the men except the defendant, as having mustaches, the following exchange took place:

> "A. I didn't look at anyone else but this gentleman here. (Indicating.)
>
> Q. The man that was wearing the hot pink pants?
>
> A. Well, I was looking at his face. That is the only thing I saw was his face." (R.58)

Later in her examination the following exchange took place:

> "Q. He was the only one who appeared clean shaven and has his eyebrows tweezed in the lineup?
>
> A. He was the only one I recognized. I wasn't paying any attention to any of the others." (R.60)

After viewing the lineup witness Jones testified she told the police officers that the defendant "was the man except for the changes." She then viewed the lineup a second time after the defendant had been instructed to put on an "afro wig". After viewing the lineup the second time she was "even more certain that he was the man."

After the hearing on defendant's motion to suppress, the trial judge found that the lineup "was to an extent suggestive." He nevertheless considered the effect of this suggestiveness on the witnesses individually. As to witness Jackson he granted the motion to suppress, finding that her identification seemed to be based on the clothing worn by defendant. As to witness Jones he denied the motion finding that it was the defendant's facial features that she was concentrating on. We find this decision of the trial judge to be error.

■■ The law is well established that if a defendant can prove that, based upon the totality of the surrounding circumstances, the confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law, the evidence of identification is rendered inadmissible unless the State can establish by clear and convincing evidence that the defendant's identification at trial is not dependent on or influenced by the improper viewing. (*Stovall v. Denno* (1967), 388 U.S. 293; *Gilbert v. California* (1967), 388 U.S. 263; *United States v. Wade* (1967), 388 U.S. 218; *People*

784

*v. Blumenshine* (1969), 42 Ill.2d 508, 250 N.E.2d 152.) The specific circumstance of the identification procedure in the instant case has met with Supreme Court disapproval.

"Similarly state reports, in the course of describing prior identifications admitted as evidence of guilt, reveal numerous instances of suggestive procedures, for example, * * * that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, * * *." *United States v. Wade* (1967), 388 U.S. at 232-33; See also *Foster v. California* (1969), 394 U.S. 440.

We are aware that there are cases wherein courts have held that pretrial confrontations were not so suggestive as to amount to a denial of due process even when the defendant is viewed in clothing described as being worn by the offender. *Young v. United States* (D.C. Cir. 1969), 407 F.2d 720, *cert. denied*, 394 U.S. 1007; *Hernandez v. State* (1969), 7 Md. App. 355, 255 A.2d 449.

However, these cases present unique factual situations unlike the situation in the instant case.

The fault common to cases wherein courts have found a denial of due process of law, as in the instant case, is that "the police single out one person and influence the witness by directing attention to some element known to be connected with the crime—the unique appearance of the suspect, the words spoken in the course of the crime, or clothing similar to the suspect's clothing. The necessary result of this singling out is to suggest to the witness that the suspect so isolated is in fact the one the police think is guilty." (*Crume v. Beto* (5th Cir. 1967), 383 F.2d 36, 39, *cert. denied*, 395 U.S. 964.) The testimony of witnesses Jackson and Jones shows that this is what occurred in the instant case.

We would further point out that the error in this case was not a result of the fact that the trial judge did not recognize the inherent suggestiveness of the lineup, but rather that he seemed to apply the *Wade-Gilbert-Stovall* rules subjectively rather than objectively. The trial judge recognized the suggestiveness of the confrontation but nevertheless, considered the effect of this suggestiveness on each individual identification witness. This we find to have been an improper application of the *Wade-Gilbert-Stovall* rules. The trial judge should have determined whether the lineup itself was unconstitutionally suggestive and not whether the suggestiveness produced an unconstitutional effect on each witness. The subjective feelings of witnesses are not the standard by which a denial of due process of law is determined.

The Supreme Court recognized in *Wade-Gilbert-Stovall* that lineups must meet the due process standards of fundamental fairness in order to

pass constitutional muster, and if they do not the evidence of identification is rendered inadmissible. (*People v. Blumenshine* (1969), 42 Ill.2d 508, 511.) To determine the constitutionality of a lineup on the basis of a witness' assurance that he was not influenced by some otherwise suggestive procedure is to allow each witness to become his own judge of the accuracy of his identification. This procedure is not contemplated in the *Wade-Gilbert-Stovall* decisions and further ignores certain problems inherent in the identification process itself. As the court said in *Crume v. Beto, supra*:

"Once a faint glimmer of recognition strikes a witness, his tendency may be to do everything in his power to reinforce that recognition and come to a positive identification. To compensate, a fair practice might be to require the police to take every reasonable precaution to insure that the witness is not overly influenced by his original impression, and that he arrives at an objective and accurate identification." 383 F.2d 36, 40.

■■ However, to hold that the instant lineup was unconstitutionally suggestive is not to say that there was a denial of due process. "Whether there was a denial depends on whether [the] identification at trial was dependent on or influenced by the improper viewing." (*People v. Blumenshine* (1969), 42 Ill.2d 508, 513.) Where the record does not permit an "informed judgment" as to whether the identification was independent of the improper confrontation at the police station the case is remanded for a hearing with the eventual use of the witnesses testimony dependent on the outcome of that hearing. *People v. Blumenshine, supra; Gilbert v. California* (1967), 388 U.S. 263, 272.

■■■ In the instant case, however, the record does permit such an informed judgment that the identification of the defendant by witness Gloria Clifford Jones was based on observations independent of the unconstitutional lineup of December 22. At trial Mrs. Jones testified she had seen the defendant on three occasions 2 days prior to the attempted robbery. On that date, December 10, 1969, Mrs. Jones was working in the drive-in window of the bank by herself. She testified that while working she saw the defendant walk by the window. He passed within three or four feet of her. She testified she saw the defendant a second time on December 10, about one-half hour later. At this time the defendant asked her if she was working alone. She didn't answer as she thought at the time the defendant was trying to flirt with her. And again, about 30 or 40 minutes later she observed the defendant a third time. On cross-examination she stated that she was positive she saw the defendant on December 10. This testimony clearly supports a finding that her identifica-

tion of the defendant had an "independent origin," and was admissible for this reason. As pointed out by the Supreme Court in *Wade* the proper test to be applied in these situations is whether, granting establishment of the primary illegality (the lineup), the identification was come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. (*United States v. Wade* (1967), 388 U.S. 218, 241.) The record in this case clearly allows the conclusion that witness Jones' identification was the result of an independent observation of the defendant and for this reason there is no need to establish this fact by a separate hearing in the trial court.

However, as to the testimony of witness Alexia Byrd Jackson we hold such a hearing must take place for the following reason. Although the lineup identification of witness Jackson was suppressed by the trial court, she was nevertheless allowed to testify at trial in such a manner as to reinforce the lineup identification testimony of witness Jones. Immediately after Gloria Clifford Jones testified at trial and identified the defendant, Alexia Byrd Jackson was called as a witness. Although she never actually identified the defendant, in compliance with the earlier order of suppression, she was allowed to state that she viewed the December 22 lineup, that one of the men in that lineup was wearing clothing that was worn by the gunman she saw at the bank, and that a photo of the lineup was an accurate portrayal of what she saw on December 22. We must agree with the defendant that this testimony, coming immediately after the testimony of Mrs. Jones who had identified the defendant in the lineup photo, served to corroborate the lineup identification of witness Jones and effectively circumvented the trial court's order of suppression so that Mrs. Jackson became an identification witness herself. (We would note here that this situation is another ramification of a trial court's subjective application of the *Wade-Gilbert-Stovall* rules.)

■■ Likewise, a similar hearing must be held on the question of whether Doris Fair may have misidentified the defendant because of the suggestive lineup. Mrs. Fair, a secretary to the president of the bank on the day in question, observed events of the attempted robbery. She gave testimony at trial to the effect that Eddie Franklin was the man she saw at the lineup of December 22, 1969, who looked like the man who shot Richard Mix, except that the man in the bank had a goatee and mustache. On cross-examination the witness admitted that she could not swear that the man she saw in the lineup was the man who shot Mix. She did not make an in-court identification. Defendant did include Mrs. Fair's name in his motion to suppress identification testimony. However, she did not testify at the hearing on the motion. At trial she testified that

the man who shot Mix was wearing a tan-colored coat with a fur collar on the day in question. Defendant was wearing the same type of coat at the lineup which Mrs. Fair viewed. At trial the court overruled defense counsel's objections to her testimony. Although the trial court tried to restrict her testimony, it amounted to an identification and was subject to the same taint of the improper lineup as was the identification testimony of Jackson and Jones.

■■■ If, at the hearing, the identification testimony of witnesses Jackson and Fair is shown to have been independent of the improper police station confrontation, the trial court will enter a new judgment reinstating the conviction. However, if the witnesses' identifications are not shown to be based on observations made other than at the police station, the trial court must grant the defendant a new trial, unless the court is able to declare that the testimony of such witnesses was harmless error beyond a reasonable doubt. (*United States v. Wade* (1967), 388 U.S. at 242; *Chapman v. California* (1967), 386 U.S. 18.) If a new trial is granted, identification testimony from the witnesses who attended the police station confrontation will be received only if the trial court determines at the hearing that the proposed testimony has a source independent of and free from the taint of the identifications made at the police station. *People v. Blumenshine* (1969), 42 Ill.2d 508, 513-14.

■■■ Because the trial court may reinstate the judgment of conviction we are vacating, we must consider two further allegations of error advanced by the defendant. The defendant contends that the court erred in refusing to give his offered instruction on the weight to be given the testimony of a narcotics addict. We must disagree with the defendant's contention, as the second sentence of his offered instruction goes beyond similar instructions approved by this court. (*People v. Phillips* (1970), 126 Ill.App.2d 179, 187, 261 N.E.2d 469; *People v. Bliss* (1966), 76 Ill.App.2d 232, 222 N.E.2d 57.) For this reason the instruction was properly refused. However, if a new trial is granted to the defendant and the testimony of witness Brooks is again in issue, the defendant should have an opportunity to show that Brooks, although presently receiving methadone, is an addict, therefore allowing a proper instruction on the weight the jury may give to his testimony.

The defendant also contends that his sentence must be modified according to the terms of the Unified Code of Corrections. (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*) Because we have vacated the judgment in this case we need not decide this issue. Any further proceedings involving sentencing in the trial court, wherein the judgment we have

788

vacated will be reinstated or a new trial granted, will be conducted in accordance with the Code.

The judgment of the circuit court is vacated and the case is remanded to the circuit court for further proceedings in accordance with the views expressed herein.

Judgment vacated and remanded with directions.

DEMPSEY and MEJDA, JJ., concur.